## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON SAUL GREENBERG, M.D.P.C., EMILY BEHAR, WENDY FRIEDMAN and MOLLY S. PIESCO, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>vs.<br><br>CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE, N.A. and CAPITAL ONE BANK (USA), N.A.<br><br>            Defendants | **CLASS ACTION COMPLAINT**<br><br>**Civil Action No.  1:19-cv-07752**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Aaron Saul Greenberg, M.D.P.C., Emily Behar, Wendy Friedman and  Molly Piesco ("Plaintiffs"), on behalf of themselves and all others similarly situated, alleges the following against Capital One Financial Corporation, Capital One, N.A. and Capital One Bank (USA), N.A. (collectively "Capital One"), based upon their personal knowledge with respect to themselves and their own acts, and upon information and belief, based upon their own investigation and the investigation of their counsel, as to all other matters, as follows:

### SUMMARY OF ACTION

1.       This is a class action brought by Plaintiffs on behalf of themselves and all other persons harmed by the cyberattack and breach of consumers' personally identifiable information ("PII" or "Personal Information") maintained by Capital One on Amazon Web Services ("AWS") (collectively, the " Data Breach" or "Breach").

2.       In a press release appended to a Form 8-K filed by Capital One on July 30, 2018 (the "July 30th 8-K"), Capital One announced that it was the subject of a hack consisting of the

unauthorized access by an outside individual who obtained certain types of Personal Information relating to persons who had applied for its credit card and to Capital One card customers.

3.      A Complaint for Violations of 18 U.S.C. §1030(a)(2), filed by the U. S. Attorney for the Western District of Washington on July 29, 2019 (the "Criminal Complaint"), asserts that between March 12, 2019 and July 17, 2019, Paige A. Thompson ("Thompson"), a former employee of AWS, intentionally accessed a computer to obtain the information belonging to Capital One, and that Capital One learned of this potential hack on July 17, 2019.

4.      According to the Criminal Complaint, Thompson was able to hack into Capital One's data base because of a firewall misconfiguration that permitted commands to reach and be executed by the server which maintained the hacked information, thereby enabling the hacker to gain access to folders or buckets of data in Capital One's storage place at AWS.

5.      Capital One on its website, updated as of August 4, 2109, states that on July 19, 2019 "we determined that an outside individual gained unauthorized access and obtained certain types of personal information about Capital One credit card customers and individuals who had applied for our credit card products."

6.      Capital One estimates that this data breach attack has impacted approximately 100 million individuals in the United States and six million in Canada confirming that this data breach is one of the largest in U.S. history.

7.      As the Criminal Complaint asserts, the data copied from Capital One's data folders or buckets consists primarily of data related to credit card applications, including applicants' names, addresses, dates of birth and information regarding their credit history, which Capital One failed to tokenize or encrypt.  It also contains approximately 140,000 social security numbers and

approximately 80,000 bank account numbers. In addition, the Social Insurance Numbers of approximately 1,000,000 Canadian citizens were compromised.

8.     Thompson subsequently posted about the theft on GitHub, and on April 21, 2019, leaked a list of more than 700 folders or buckets, as well as commands that enabled users to reach Capital One's date stored on AWS's servers.  Capital One subsequently determined that a List Buckets Command was executed on April 21, 2019, and that it had evidence of that in its computer logs. According to AWS a bucket can hold up to 5 Terabytes of information.

9.     Its investigation further showed that Thompson had made several earlier attempts in March to obtain this information and to take advantage of the misconfigured firewall, but that Capital One did not recognize this suspicious activity.  Criminal Comp. ¶13.

10.     Capital One chief executive officer, Richard Fairbank, has issued an apology, and as compensation for the Breach and Capital One's apparent neglect in the maintenance of its firewall in identifying Thompson's suspicious activity, has offered users and Class members complimentary credit monitoring and identity protection services.   Neither of these can compensate Plaintiffs and Class members for the increased risk of identity theft, and fraud which could or has occurred as a consequence of the loss of this information.

11.     Further, as recently as August 15, 2019, an article appeared in *The Wall Street Journal* [1] (hereinafter "August 15 WSJ article") describing various significant problems that Capital One was experiencing during the affected period with its cybersecurity unit that

---

[1] See article August 15 WSJ entitled "Capital One Cyber Staff Raised Concerns Before Hack" found online at https://www.wsj.com/articles/capital-one-cyber-staff-raised-concerns-before-hack-11565906781 (last accessed 8/16/19).

demonstrate that it was aware or should have been aware of significant problems which were a precursor to the Breach:

> Before a giant data breach at Capital One Financial Corp. … employees raised concerns within the company about what they saw as high turnover in its cybersecurity unit and a failure to promptly install some software to help spot and defend against hacks, according to people familiar with the matter.
> The cybersecurity unit—responsible for ensuring Capital One's firewalls were properly configured and scanning the internet for evidence of a data breach—has cycled through senior leaders and staffers in recent years, according to the people. About a third of its employees left in 2018, some of the people said.

12.     By way of this action ("Action"), Plaintiffs seek to recover compensation for Class members for their risk and other damage which they have and will continue to suffer as a consequence of the Breach.

## PARTIES

13.     Plaintiff Aaron Saul Greenberg, M.D.P.C. resides in New York and applied for and maintained a Capital One business credit card during the affected period. Plaintiff has been a Capital One Spark Business card member, as well as a Capital One Venture One member since December 2016.

14.     Plaintiff Emily Behar is a resident of Florida and applied for and maintained a Capital One credit card account during the affected period.  She has been a Capital One Visa card member since August 20, 2018.  Ms. Behar received a data breach notification letter dated August 7, 2019 from Capital One informing her that, among other things, she is part of a subset of 140,000 consumers who had their social security numbers compromised in the Data Breach.

15.      Plaintiff Wendy Friedman is a resident of Florida and applied for and maintained a Capital One credit card account during the affected period. She has been a Capital One Venture One card member since 2012.

16.    Plaintiff Molly S. Piesco is a resident of New Jersey and applied for and maintained a Capital One credit card account during the affected period. She has been a Capital One Platinum MasterCard member since March 2016.

17.    Defendant Capital One Financial Corporation is a Delaware corporation with a principal place of business at 1680 Capital One Drive, McLean, Virginia.  It is a bank holding company that specializes in credit cards, but also offers other credit, including automobile loans, as well as a variety of bank accounts.  Capital One Financial Corporation operates through its two primary subsidiaries Capital One Bank (USA), N.A. and Capital One, N.A.

18.    Capital One Bank (USA), N.A., is one of Capital One Financial Corporation's two principal subsidiaries that offers credit and debit card products to its consumers.

19.    Capital One, N.A. is on of Capital One Financial Corporation's two principal subsidiaries that offers banking products and financial services to consumers, small businesses and commercial clients.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this Action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of costs and interest.  At least one member of the putative Class is a citizen of a state different from that of the Capital One. There are more than 100 putative Class members.

21.    This Court has personal jurisdiction over Capital One because it does business in this district.  Capital One provides credit card services throughout the United States, and, as such, has continuous and systematic contact with New York sufficient to provide it with the minimum contacts necessary to satisfy the principles of fair play and substantial justice and requirements of

New York's long arm statute.  Capital One has further committed a tortious act within this State.

Capital One has purposefully availed itself of the law of New York.

22.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because

Capital One has committed a tortious act here, and a substantial part of the events, acts and

omissions giving rise to Plaintiffs' claims occurred in this judicial district.

### FACTUAL ALLEGATIONS

23.    As a financial institution, Capital One has publicly stated that safeguarding its

customers' information is essential to its mission and that it has invested heavily in cybersecurity.

24.    Its current privacy policy ("Privacy Policy") specifically represents to its customers

that in capital letters that "CAPITAL ONE TAKES OUR COMMITMENT TO PROTECTING

YOUR PRIVACY SERIOUSLY" and that "[t]o protect your personal information from

unauthorized access and use, we use security measures that comply with federal laws.  These

measures include computer safeguard and secured files and buildings."

25.    Despite these representations and its duties as a financial institution, because of  its

negligence, Capital One left itself vulnerable to a hack of critical, confidential customer

information.

26.    On July 30, 2018, Capital One for the first time announced that it had been hacked,

and that critical customer information residing at servers maintained by AWS, had been stolen by

a former AWS software engineer.

27.    Thompson, the engineer, had posted the fact that she had stolen the information as

early as April 2019.  Moreover, she had made several attempts to hack Capital One's information

throughout March 2019. As noted above, on April 21, 2019 she leaked the list of "buckets" of

information and the commands necessary to access this information on AWS servers. Nonetheless,

Capital One failed to discover both Thompson's efforts, and the hack until a previously unknown tipster emailed Capital One and informed it of the hack on July 17, 2019.

28.    However, the effectiveness of Capital One's cybersecurity unit was known to be decidedly compromised. As described in the August 15 WSJ article:

> Cybersecurity falls under the chief information security officer. The bank in 2017 hired Michael Johnson for the role. Mr. Johnson, a veteran of the federal government, quickly clashed with employees who thought his style was unsuited to the private sector, according to the people.
>
> He berated employees and prioritized building what he called his own "front office" that included administrators and employees who helped with internal public relations, the people said.
>
> Senior cybersecurity employees unhappy under Mr. Johnson left for comparable, or better, jobs elsewhere, the people said. Some went to other divisions at Capital One. Most of Mr. Johnson's initial direct reports have departed. Some of their replacements have left too.

29.    Moreover, the article continues:

> Routine cybersecurity measures to help protect the company sometimes fell by the wayside, some of the people said. For instance, the bank around late 2017 bought software from a company called Endgame to improve its ability to detect hacks, some of the people said. More than a year after buying the software, Capital One still hadn't finished installing it, one of the people said. The issue was flagged to Mr. Johnson, the bank's internal auditors and others, according to one of the people. It couldn't be determined how they responded. Endgame declined to comment.

30.    Although Capital One knew since that time of the Data Breach, which it learned of reportedly on July 17, although on its website it claimed that it was not until July 19 that they were able to determine the Data Breach, it did not publicly disclose the Data Breach or inform customers of the Breach until July 30, 2019.

31.    In addition, despite Capital One's supposed expertise in the technology area the breach was surprising

….because it ran counter to a popular perception that the bank was ahead of the game in technology. Prosecutors have said that the hacker began attempting to access the bank's information in March, but Capital One didn't learn of it until it was tipped off by an outside researcher 127 days later.[2]

32.    The cause of the Data Breach, as announced thus far, is Capital One's failure to properly maintain its firewall for information that resides on the servers of AWS, and its failure to encrypt certain of the sensitive information.

33.    The Data Breach is one of the largest in history, as the hacked information likely contains data for over 100 million credit card applicants in the United States and many more in Canada, exposing potential Class and Subclass Members to extensive damage.

34.    Capital One Chairman and Chief Executive Officer, Richard Fairbank, has issued an apology, and as compensation for this breach, and Capital One's apparent neglect in the maintenance of its firewall and in identifying Thompson's suspicious activity, has offered users and Class members complimentary credit monitoring and identity protection services, neither of which can compensate Plaintiffs and Class members for the increased risk of identity theft, and fraud which could occur as a consequence of the loss of this information.

35.    The New York Attorney General's office has announced that it is launching an investigation into the Breach.  The New York Department of Finance has reiterated that it will use all of its tools to protect New Yorkers.

36.    Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by their PII being placed in the hands of criminals who have already, or will imminently, misuse such information.

---

[2] See August 15 WSJ Article.

37.     Moreover, Plaintiffs have a continuing interest in ensuring that their Private Information, which remains in the possession of Capital One, is protected and safeguarded from future breaches.

38.     At all relevant times, Capital One was well-aware, or reasonably should have been aware, that the PII collected, maintained and stored in its systems is highly sensitive, susceptible to attack, and could be used for wrongful purposes by third parties, such as identity theft and fraud.

39.     It is well known and the subject of many media reports that PII is highly coveted and a frequent target of hackers. Despite the frequent public announcements of data breaches Capital One continued to use insufficient and inadequate system to protect the PII of Plaintiffs and Class members.

40.     PII is a valuable commodity because it contains not only payment card numbers but PII as well. A "cyber blackmarket" exists in which criminals openly post stolen payment card numbers and other personal information on a number of underground Internet websites. PII is "as good as gold" to identity thieves because they can use victims' personal data to incur charges on existing accounts, or clone ATM, debit, or credit cards.

41.     Legitimate organizations and the criminal underground alike recognize the value in PII contained in a merchant's data systems; otherwise, they would not aggressively seek or pay for it.

42.     At all relevant times, Capital One knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on individuals as a result of a breach.

43.     Capital One was, or should have been, fully aware of the significant number of people whose PII it collected, and thus, the significant number of individuals who would be harmed by a breach of its systems.

44.     Unfortunately, and as alleged below, despite all of this publicly available knowledge of the continued compromises of PII in the hands of other third parties, Capital One's approach to maintaining the privacy and security of the PII of Plaintiffs and Class members was lackadaisical, cavalier, reckless, or at the very least, negligent.

45.     The ramifications of Capital One's failure to keep Plaintiffs' and Class members' data secure are severe.

46.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[3]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[4]

47.     Personal and financial information is a valuable commodity. A cyber black-market exists in which criminals openly post stolen credit card numbers, Social Security numbers, and other personal information on a number of Internet websites. A credit card number trades for under $10 on the black market. Magnetic track data increases the price, and a card with full personal information such as an address, phone number, and email address (known in slang by those who hack as "fullz") are traded at around $25 per record.[5] As the FTC recognizes, once identity thieves

---

[3] 17 C.F.R § 248.201 (2013).

[4] *Id*.

[5] See article entitled "Here's what your stolen identity goes for on the internet's black market", in "Quartz", 7/23/15 available online at https://qz.com/460482/heres-what-your-stolen-identity-goes-for-on-the-internets-black-market/.

have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[6]

48.    The consequences to affected consumers are significant as sensitive personal and financial information is exposed. It is further exacerbated when, as here, at least one of the Plaintiffs' compromised PII included her Social Security number which make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[7]  Each of these fraudulent activities is difficult to detect and may not be uncovered until the number has been used in a fraudulent transaction. Moreover, it is no easy task to change or cancel a stolen Social Security number. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number.[8]

49.    Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[9]

_____

[6] Federal Trade Commission, *Warning Signs of Identity Theft*, available at: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited August 16, 2019).

[7] The United States Government Accountability Office explained that theft involving social security numbers is the most insidious not only because it often takes time for the victim to become aware of the theft, but that as a result they will often face "substantial costs and inconveniences repairing damage to their credit records... [and their] good name." Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown, GAO (June 2007), available at https://www.gao.gov/new.items/d07737.pdf (the "GAO Report")(last visited August 19, 2019).

[8] Victims of Social Security Number Theft Find It 's Hard to Bounce Back, NPR, Brian Naylor, Feb. 9, 2015, available at http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has- millions-worrying-about-identity-theft (last visited August 19, 2019).

[9]  *See*  https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-  hits-inflection-

50.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit.  After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[10]

51.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII or PCD is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[11]

52.     Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and the Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

53.     The PII of Plaintiffs and Class members is private and sensitive in nature and was left inadequately protected by Capital One.

---

point (last visited August 16, 2019).

[10] Victims of Identity Theft, 2014 (November 13, 2017) available at: http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited August 16, 2019).

[11] GAO, Report to Congressional Requesters, at 29 (June 2007), available at: http://www.gao.gov/new.items/d07737.pdf (last visited August 16, 2019).

54.     The Data Breach was a direct and proximate result of Capital One's failure to properly safeguard and protect Plaintiffs' and Class members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Capital One's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

55.     Capital One had the resources to prevent a breach, but neglected to timely and adequately invest in data security, despite the growing number of well-publicized data breaches.

56.     Had Capital One remedied the deficiencies in its data security systems, followed security guidelines, and adopted security measures recommended by experts in the field, Capital One would have prevented the Data Breach and, ultimately, the theft of its customers' PII.

57.     As a direct and proximate result of Capital One's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.  In all manners of life in this country, time has constantly been recognized as compensable, for many consumers it is the way they are compensated, and even if retired from the

work force, consumers should be free of having to deal with the consequences of Capital One's slippage, as is the case here.

58.    Capital One's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    theft of their personal and financial information;

b.    unauthorized charges on their debit and credit card accounts;

c.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the black market;

d.    the improper disclosure of their PII;

e.    ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

f.    ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

g.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and,

h.    the loss of productivity and value of their time spent to address attempt to

ameliorate, mitigate and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

59.    While the PII of Plaintiffs and members of the Class has been stolen, Capital One continues to hold PII of consumers, including Plaintiffs and Class members. Particularly because Capital One and has demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and members of the Class have an undeniable interest in insuring that their PII is secure, remains secure, is properly and promptly destroyed and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

60.    Plaintiffs bring this class action pursuant to the Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of themselves and all others similarly situated who used, applied for and/or maintained a credit card with Capital One from the period of 2005 to April 2019 (the "affected period") and suffered damage or will suffer damage as a result of the Data Breach (the "Nationwide Class"). Excluded from the Class are Capital One, any subsidiary, affiliate, parent, division or subdivision of the Capital One, and any employee or agent of Capital One.

61.    In the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims under the laws of three individual States, and on behalf of separate State Subclasses, defined as follows:

> All persons residing in New York and non-residents, who used, applied for and/or maintained a credit card in New York with Capital One from the period of 2005 to April 2019 (the "New York Subclass").

All persons residing in New Jersey or non-residents, who used, applied for and/or maintained a credit card with Capital One from the period of 2005 to April 2019 (the "New Jersey Subclass").

All persons residing in Florida and non-residents, who used, applied for and/or maintained a credit card with Capital One from the period of 2005 to April 2019 (the "Florida Subclass").

62.     The Class and Subclasses consists of approximately of millions of persons.  As such, its members are so numerous that joinder is impracticable.

63.     Questions of law and fact common to all members of the Class and Subclasses predominate, including:

a. whether Capital One acted negligently and/or wrongfully by failing to properly safeguard Plaintiffs' and Class and Subclass members' PII;

b. whether Capital One failed to give timely and adequate notice of the Breach;

c. whether Capital One's conduct violated the law; and

d. whether Plaintiffs and the other Class and Subclass members have been damaged, and, if so, the relief that is appropriate.

64.     Plaintiffs' claims, as described herein, are typical of the claims of other Class and respective Subclass members as Plaintiffs' claims and those of other Class and Subclass members arise from the same set of facts regarding Capital One's failure to protect Plaintiffs' and Class members' private, Personal Information. Plaintiffs maintain no interests antagonistic to the interests of other Class or Subclass members.

65.     Plaintiffs are committed to the vigorous prosecution of this Action and has retained competent counsel experienced in the prosecution of class actions of this type.

66.     Accordingly, Plaintiffs are adequate representatives of the Class and Subclasses and will fairly and adequately protect its interests.

67.     This class action is a fair and efficient method of adjudicating the claims of Plaintiff and Class and Subclass members for the following reasons:

a.  common questions of law and fact predominate over any question affecting any individual Class members;

b.  the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, thereby establishing incompatible standards of conduct for Capital One, or would allow the claims of some Class members to adversely affect the claims of other Class members, thereby affecting their ability to protect their interests; and

c.  this forum is appropriate for litigation of this Action since a substantial portion of the transactions, acts, events, and omissions alleged herein occurred in this judicial district.

68.     Plaintiffs anticipate no difficulty in the management of this litigation as a class action, as the Class and Subclasses are readily definable, and its prosecution as a class action will eliminate the possibility of repetitious litigation, while providing redress for claims that may be too small to support the expense of individual, complex litigation.

69.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Negligence
### (On behalf of all Classes)

70.     Plaintiffs incorporate all of the allegations in this Complaint as if fully set forth herein.

71.    Capital One owed a duty to Plaintiffs and other Class members to exercise reasonable care in obtaining, retaining, sharing, securing, safeguarding, and deleting their PII and protecting that information from being compromised, lost, stolen and misused by an unauthorized person.  They also owed Plaintiffs and the Class a duty to timely disclose the Data Breach.

72.    This duty included, among other things, designing, maintaining, updating, modernizing and testing its computer network and its interface with its partners, to ensure that Plaintiffs' and Class members' PII was adequately secured and protected, and to timely inform them, or any third party partner for whom Capital One acted as the search engine, of any breach.

73.    Capital One further owed a duty to Plaintiffs and Class members to implement processes in a timely manner that would detect a breach of its systems and prevent a mass export of users' PII.

74.    Capital One owed a duty to Plaintiffs and Class members to provide security consistent with industry standards, including ensuring that such private information was kept on secure systems.  Its acts in failing to secure this information has created this relationship.

75.    Plaintiffs and Class members, who provided Capital One with their personal, private information were the foreseeable and probable victims of a data breach of Capital One's information.

76.    Capital One was in a special relationship of trust with Plaintiffs and Class members by being entrusted with their PII.  By reason of this special relationship, Capital One had a duty of reasonable care, which it unlawfully breached.

77.    In the absence of negligence, Capital One would have known that its failure to properly construct its firewall and to detect potential hacking would cause damage to Plaintiffs and other Class members and that it had a duty to adequately protect such information.

78.     Plaintiffs and Class members entrusted their PII to Capital One based upon their belief and understanding that Capital One would safeguard such information and had mechanisms available to protect such information from a data breach.

79.     By negligently failing to take adequate steps to maintain their firewall and to detect the hacking, which made sensitive customer information vulnerable to attack, Capital One acted without reasonable due care and thereby breached their duties to Plaintiffs and Class members.

80.     Capital One's breach of their duty of due care, proximately caused damage and will continue to cause damage to Plaintiffs and Class members.

81.     Capital One committed this tortious act in violation of its Privacy Policy.

## COUNT II

### Bailment
### (On behalf of all Classes)

82.     Plaintiffs incorporate all of the allegations in this Complaint as if fully set forth herein.

83.     Plaintiffs and Class members provided their PII to Capital One for the exclusive purpose of obtaining a credit card and using that card.

84.     In delivering their PII to Capital One, Plaintiffs and Class members understood that Capital One would adequately safeguard this information.  This was confirmed in Capital One's Privacy Policy.

85.     Capital One accepted possession of Plaintiffs' and other Class members' PII for purposes of issuing a credit card and extending credit.

86.     In accepting this information, Capital One understood that Plaintiffs and other Class members expected Capital One to adequately safeguard their PII, as reflected in the Capital One Privacy Policy.  Accordingly, a bailment was established for the mutual benefit of the parties.

87.     During the bailment, Capital One owed a duty to Plaintiffs and other Class members to exercise reasonable care, diligence and prudence in protecting their PII

88.      As a direct and proximate cause of Capital One's breach of duty, Plaintiffs and Class members suffered and will suffer consequential damages that were reasonably foreseeable to Capital One, including but not limited to the damages sought herein.

## COUNT III

### Negligence *Per Se*
### (On behalf of all Classes)

89.     Plaintiffs repeat and reallege all of the allegations stated in this Complaint as if fully set forth herein.

90.     Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, prohibits "unfair . . . practices in or affecting commerce" including, the act of failing to use reasonable measures to protect Personal Information.

91.     Capital One violated Section 5 of the FTC by failing to use reasonable measure to protect Personal Information and not complying with industry standards.

92.     Capital One's violation of Section 5 of the FTC Act constitute negligence per se.

93.     Class members are consumers within the class of persons that Section 5 of the FTC Act was intended to protect.

94.     The harm caused by Capital One constitutes the type of harm that the FTC Act was intended to guard against.  The FTC has pursued over fifty enforcement actions against businesses for causing similar harm by failing to employ reasonable data security measures and avoid unfair and deceptive practices.

95.     As a direct and proximate result of Capital One's negligence, Plaintiffs and Class members have been injured and are entitled to damages.

## COUNT IV

### Breach of Implied Contract
### (On behalf of all Classes)

96.     Plaintiffs repeat and reallege each of the allegations of this Complaint as if fully set forth herein.

97.     In applying for credit at Capital One, Plaintiffs and the other members of the Class entered into an implied contract with Capital One, whereby Capital One became obligated to reasonably safeguard Plaintiffs and the other Class members' Private Information.

98.     Under the implied contract, Capital One was obligated to not only safeguard the Private Information, but also to provide Plaintiffs and the other Class members with prompt, truthful, and adequate notice of any security breach or unauthorized access of said information.

99.     Capital One breached the implied contract with Plaintiffs and the other members of the Class by failing to take reasonable measures to safeguard their Private Information.

100.     Capital One also breached its implied contract with Plaintiffs and the other Class members by failing to provide prompt, truthful, and adequate notice of the Breach and unauthorized access of their Private Information by Thompson.

101.     Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) improper disclosure of their Personal Information; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and identity fraud pressed upon them by the Breach; (iii) the value of their time spent mitigating the increased risk of identity theft and/or identity fraud; (iv) the increased risk of identity theft; and (v) deprivation of the value of their Personal Information, which is likely to be sold to cyber criminals on the dark web.

**COUNT V**

**Violation of New York's Data Breach Laws – Delayed Notification or N.Y. Gen. Bus. Law
§ 899-aa
(On behalf of the New York Subclass)**

102.    Plaintiff Aaron Saul Greenberg, M.D.P.C. ("Plaintiff" for purposes of this Count) repeats and realleges all of the allegations of this Complaint as if fully set forth herein.

103.    Section 899-aa (3) of the New York General Business Law requires any "person or business which maintains computerized data which includes private information which such person or business does not own shall notify the owner or licensee of the information of any breach of the security of the system immediately following discovery, if the private information was, or is reasonably believed to have been, acquired by a person without valid authorization."

104.    The security breach notification shall be directly provided to the affected persons by: (a) written notice; (b) electronic notice, provided that the person to whom notice is required has expressly consented to receiving said notice in electronic form and a log of each such notification is kept by the person or business who notifies affected persons in such form; provided further, however, that in no case shall any person or business require a person to consent to accepting said notice in said form as a condition of establishing any business relationship or engaging in any transaction; (c) telephone notification provided that a log of each such notification is kept by the person or business who notifies affected persons; or (d) substitute notice, if a business demonstrates to the state attorney general that the cost of providing notice would exceed two hundred fifty thousand dollars, or that the affected class of subject persons to be notified exceeds five hundred thousand, or such business does not have sufficient contact information. N.Y. Gen. Bus. Law § 899-a (5).

105.   The Breach described herein this Complaint constitutes a "breach of the security system" of Capital One.

106.   As alleged above, Capital One learned as early as July 17, 2019 of the Breach, yet unreasonably delayed informing Plaintiff and the other New York Class members about the Breach, affecting the confidential and non-public Private Information of Plaintiff and other New York Subclass members after Capital One knew the Breach had occurred.

107.   Capital One failed to disclose to Plaintiff and New York Subclass members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Private Information when Capital One knew or reasonably believed such information had been compromised.

108.   Capital One's ongoing business interests gave Capital One incentive to conceal the Breach from the public to ensure continued revenue.

109.   Upon information and belief, no law enforcement agency instructed Capital One that notification to Plaintiff and the New York Subclass members would impede Capital One's investigation.

110.   As a result of Capital One's violation of New York law, Plaintiff and New York Subclass members were deprived of prompt notice of the Breach and were thus prevented from taking appropriate protective measures, including securing identity theft protection, or requesting a credit freeze. These measures would have prevented some of the damages the Plaintiff and Class members suffered.

111.   As a result of Capital One's violation of New York law, Plaintiff and New York Subclass members have suffered incrementally increased damages separate and distinct from those simply caused by the breaches themselves.

**COUNT VI**

**Violation of New York Consumer Law for Deceptive Acts and Practices and False
Advertising or New York Gen. Bus. Law § 349
(On Behalf of the New York Subclass)**

112.    Plaintiff Aaron Saul. Greenberg, M.D.P.C. individually and on behalf of the other

New York Subclass members, ("Plaintiff" for purposes of this Count) repeats and realleges all of

the allegations of this Complaint as if fully set forth herein.

113.    Plaintiff and New York Subclass members seek all remedies available under New

York law, including, but not limited to damages as well as equitable relief.

114.    Capital One's practices, acts, policies and course of conduct, as described herein,

including making representations that they possessed sufficient security that complied with federal

law to maintain the privacy of  users' Personal Information were intended to induce, and did

induce, Plaintiff and the New York Subclass to allow their Personal Information to be  provided

to Capital One.

115.    Plaintiff and the New York Subclass members never would have provided their

Personal Information if they had been told or knew that Capital One and its sub-vendors failed to

maintain sufficient security to keep such Personal Information from being hacked and taken by

others, or that Capital One's failed to ensure that such information would be maintained in

encrypted form.

116.    Capital One's practices, acts, policies and course of conduct are actionable  in that:

a.    Capital One actively and knowingly misrepresented or omitted disclosure

of material information to Plaintiff and the New York Subclass at the time they

provided Personal Information that Capital One did not have sufficient security

or mechanisms to protect such information; and

b.      Capital One failed to give adequate warnings and notices, failed to take an adequate investigation, and failed to conduct due diligence of AWS to whom it entrusted Sub-Class members Personal Information regarding the defects and problems with its system(s) of security systems that it maintained to protect Plaintiff's and the New York Subclass's Personal Information. Capital One possessed prior knowledge of the inherent defects in its' and AWS's systems and failed to address the same or to give adequate and timely warnings that there had been a Breach and hacking episodes had occurred.

117.    The aforementioned conduct is and was deceptive, false, and fraudulent and constitutes an unconscionable commercial practice in that Capital One has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the defective security system they maintained and failed to reveal the Breach timely and adequately.

118.    Members of the public were deceived by and relied upon Capital One's affirmative misrepresentations and failures to disclose.

119.    Such acts by Capital One are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer providing their Personal Information to Capital One. Said deceptive acts and practices aforementioned are material. Such acts both occurred in New York and concerned New York residents and/or citizens was a consumer-oriented act and thereby falls under the New York consumer fraud statute, General Business Law §§ 349 and 350.

120.    Capital One's wrongful conduct caused Plaintiff and the New York Subclass to suffer a consumer-related injury by causing them to incur substantial expense for protection from

misuse of the Personal Information by third parties and placing Plaintiff and the New York Subclass at serious risk for monetary damages.

121.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the New York Subclass seek statutory damages for each injury and violation which has occurred.

**COUNT VII**
**Violations of New Jersey Consumer Security Breach Disclosure Act,**
**N.J. Stat. Ann. §§ 56, 8-163, et seq.**
**(On behalf of the New Jersey Subclass)**

122.    Plaintiff Molly S. Piesco ("Plaintiff" for purposes of this Count), individually and on behalf of the other New Jersey Subclass members, repeats and re-alleges the allegations contained in all paragraphs as though fully set forth herein.

123.    Under N.J. Stat. Ann. §§ 56, 8-163(b), "[A]ny business . . . that complies or maintains computerized records that include personal information on behalf of another business or public entity shall notify the business or public entity, who shall notify its New Jersey customers . . . of any breach of security of the computerized records immediately following discovery, if the personal information was, or is reasonably believed to have been, accessed by an unauthorized person."

124.    Capital One is a business that compile or maintain computerized records that include personal information on behalf of another business under N.J. Stat. Ann. §§ 56, 8-163(b).

125.    Plaintiff's and New Jersey Subclass members' Personal Information includes personal information covered under N.J. Stat. Ann. §§ 56, 8-163, *et seq*.

126.    Because Capital One discovered a breach of their security system in which personal information was, or is reasonably believed to have been, acquired by an unauthorized person and

the personal information was not secured, Capital One had an obligation to disclose the data breach

in a timely and accurate fashion as mandated under N.J. Stat. Ann. §§ 56, 8-163, et seq.

127.    By failing to disclose the data breach in a timely and accurate manner, Capital One

violated N.J. Stat. Ann. §§ 56, 8-163(b).

128.    As a direct and proximate result of the Capital One's violations of N.J. Stat. Ann.

§ 56, 8-163(b), Plaintiff and New Jersey Subclass members suffered the damages described above.

129.    Plaintiff and New Jersey Subclass members seek relief under N.J. Stat. Ann. §§ 56,

8-19, including but not limited to actual damages, attorneys' fees and costs, and injunctive relief.

### COUNT VIII

**Violation of New Jersey's Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1, et seq. ("NJCFA")**
**(On behalf of the New Jersey Subclass)**

130.    Plaintiff Molly S. Piesco ("Plaintiff," for purposes of this Count), individually and

on behalf of the other New Jersey Subclass members, repeats and re-alleges all allegations herein

as though fully set forth herein.

131.    As alleged herein, Capital One, while operating in New Jersey, engaged in

unconscionable commercial practices, deception, misrepresentation, and the knowing

concealment, suppression, and omission of material facts with intent that others rely on such

concealment, suppression, and omission, in connection with the sale and advertisement of services,

in violation of N.J. Stat. Ann. § 56.8-2. This includes, but is not limited to the following:

a.    failure to maintain the security of credit and/or debit card account information;

b.    failure to maintain adequate computer systems and data security practices to
safeguard credit and debit card information and other Personal Information;

c.    failing to detect the Breach in a timely manner;

    d.   failure to disclose that their computer systems and data security practices were inadequate to safeguard credit and debit card information and other Personal Information from theft;

    e.   continued acceptance of Personal Information and storage of other personal information after Capital One knew or should have known of the security vulnerabilities of the systems that were exploited in the Breach; and allowing unauthorized persons to have access to and make unauthorized charges to their customers' credit and/or debit card accounts

132.    Capital One knew or should have known that its computer systems and data security practices were inadequate to safeguard the Personal Information of Plaintiff and New Jersey Subclass members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

133.    As a direct and proximate result of Capital One's violations above, Plaintiff and New Jersey Subclass members suffered damages including, but not limited to:

    a.   unauthorized use of their Personal Information;

    b.   theft of their personal and financial information;

    c.   costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    d.   damages arising from the inability to use their Personal Information;

    e.   loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed

payments on bills and loans, late charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

f.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address an attempt to ameliorate, mitigate and deal with the actual and future consequences of the Security Breach, including finding fraudulent charges, purchasing credit monitoring and identity theft protection services, initiating and monitoring credit freezes, and the stress, nuisance and annoyance of dealing with all issues resulting from the Security Breach; and

g.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being placed in the hands of criminals and already misused via the sale of Plaintiff and New Jersey Subclass members' information on the Internet black market.

134.    As a direct result of Capital One's knowing violation of the NJCFA, Plaintiff and New Jersey Subclass members are entitled to damages as well as injunctive relief, including, but not limited to:

a.  ordering that Capital One engages third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Capital One' systems on a periodic basis, and ordering Capital One to promptly correct any problems or issues detected by such third-party security auditors;

b.  ordering that Capital One audit, test, and train its security personnel regarding any new or modified procedures;

c. ordering that Capital One segment Personal Information by, among other things, creating firewalls and access controls so that if one area of Capital One's systems is compromised, hackers cannot gain access to other portions of Capital One' systems;

d. ordering that Capital One purges, deletes, and destroys in a reasonably secure manner Personal Information not necessary for their provisions of services;

e. ordering that Capital One conduct regular database scanning and security checks;

f. ordering that Capital One routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and ordering Capital One to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Capital One's customers must take to protect themselves.

135.   Plaintiff brings this action on behalf of herself and the New Jersey Subclass for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and the New Jersey Subclass and the public from Capital One's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Capital One's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

136.    Plaintiff and the New Jersey Subclass also seek actual damages, injunctive and/or other equitable relief and treble damages, and attorney's fees and costs pursuant to Federal Rule of Civil Procedure 23 and N.J. Stat. Ann. § 56:8-19.

## COUNT IX

**Violation of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(On behalf of the Florida Subclass)**

137.    Plaintiffs Emily Behar and Wendy Friedman ("Plaintiffs," for purposes of this Count), individually and on behalf of the other Florida Subclass members, repeat and re-allege all allegations in this complaint as though fully set forth herein.

138.    At all relevant times, Plaintiffs and Florida Subclass members were "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat § 501.201 *et seq.* ("FDUTPA").

139.    Capital One is engaged in trade and commerce in Florida.

140.    Plaintiffs and the Florida Subclass entrusted Capital One with their Personal Information.

141.    As alleged in this Complaint, Capital One engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including the following, in violation of the FDUTPA:

> a.   failure to maintain the security of credit and/or debit card account information;
>
> b.   failure to maintain adequate computer systems and data security practices to safeguard credit and debit card information and other Personal Information;

c.  failure to disclose that its computer systems and data security practices were inadequate to safeguard credit and debit card information and other Personal Information from theft;

d.  failing to detect the Breach in a timely fashion;

e.  continued acceptance of Personal Information and storage of other personal information after Capital One knew or should have known of the security vulnerabilities of the systems that were exploited in the Security Breach; and

f.  allowing unauthorized persons to have access to and make unauthorized charges to their customers' credit and/or debit card accounts.

142.    Capital One knew or should have known that its computer systems and data security practices were inadequate to safeguard the Personal Information of Plaintiffs and Florida Subclass members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

143.    As a direct and proximate result of Capital One' violation of FDUTPA, Plaintiffs and the Florida Subclass suffered damages including, but not limited to:

a.  unauthorized use of their Personal Information;

b.  theft of their Personal Information;

c.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.  damages arising from the inability to use their Personal Information;

e.  loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed

payments on bills and loans, late charges and fees, and adverse effects on their

credit including decreased credit scores and adverse credit notations; and

f.   costs associated with time spent and the loss of productivity or the enjoyment

of one's life from taking time to address an attempt to ameliorate, mitigate and

deal with the actual and future consequences of the Breach, including finding

fraudulent charges, purchasing credit monitoring and identity theft protection

services, initiating and monitoring credit freezes, and the stress, nuisance and

annoyance of dealing with all issues resulting from the Breach.

144.   As a direct result of Capital One' knowing violation of FDUTPA, Plaintiffs and the

Florida Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

a.   ordering that Capital One engaged third-party security auditors/penetration

testers as well as internal security personnel to conduct testing, including

simulated attacks, penetration tests, and audits on Capital One's systems on a

periodic basis, and ordering Capital One to promptly correct any problems or

issues detected by such third-party security auditors;

b.   ordering that Capital One audit, test, and train its security personnel regarding

any new or modified procedures;

c.   ordering that Capital One segment Personal Information by, among other

things, creating firewalls and access controls so that if one area of Capital One

is compromised, hackers cannot gain access to other portions of Capital One's

systems;

d.   ordering that Capital One purges, deletes, and destroys in a reasonably secure

manner Personal Information not necessary for their provisions of services;

e.   ordering that Capital One conducts regular database scanning and security checks;

f.   ordering that Capital One routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

g.   ordering Capital One to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps their customers must take to protect themselves.

145.   Plaintiffs bring this action on behalf of themselves and Florida Subclass members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs and Florida Subclass members and the public from Capital One's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Capital One's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

146.   Plaintiffs and the Florida Subclass members seek actual damages under Fla. Stat. § 501.211(2) and all fees, costs, and expenses allowed by law, including attorney's fees and costs, pursuant to Federal Rule of Civil Procedure 23 and Fla. Stat. §§ 501.2105 and 501.211, to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court provide the following relief:

a.  Certifying this Action as a Class action and appointing Plaintiffs as adequate representatives of the Class and the respective Subclasses, and their counsel as Class counsel;

b.  Entering judgment, including pre-judgment and post-judgment interest, in favor of Plaintiffs and the Class and Subclasses and against Capital One;

c.  Awarding Plaintiffs and Class and Subclass members appropriate relief, including actual and statutory damages, restitution, disgorgement and, where appropriate, injunctive relief requiring Capital One to take steps to ensure against a recurrence of the Breach by adopting and implementing reasonable data security measures, among other things;

d.  Awarding Plaintiffs and Class and Subclass members attorney's fees, expenses, and costs of this Action; and

e. Ordering such further and other relief as the Court deems necessary.

## JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the putative Class, demand trial by jury on all issues so triable.

Dated:  August 19, 2019

By: *Melissa R. Emert*

Melissa R. Emert
Howard T. Longman
**STULL, STULL, & BRODY**
6 East 45th Street-5th Floor
New York, NY 10017
Tel : (954) 341-5561
Fax: (954) 341-5531
memert@ssbny.com
hlongman@ssbny.com

*Attorneys for Plaintiffs and the Class*